**UNITED STATES DISTRICT COURT**
**DISTRICT OF DELAWARE**

| | |
|---|---|
| Christopher Wenzke,<br><br>                      Plaintiff,<br><br>  – against–<br><br><br>T-Mobile US, Inc., John Does 1-25,<br><br>                  Defendant(s). | Civil Action No.<br><br><br>**COMPLAINT** |

Plaintiff, Christopher Wenzke ("Plaintiff"), by and through undersigned counsel,

complains and alleges as follows against Defendant, T-Mobile US, Inc.:

## INTRODUCTION

1. This case arises out of the hacking of Plaintiff's personal information, which occurred on two occasions and which was facilitated, aided and abetted by T-Mobile's employees at two different T-Mobile stores.

2. As detailed herein, T-Mobile, through its employees, allowed hackers in two separate instances to swap Plaintiff's SIM card into a cellular phone controlled by the hackers, paving the way for the hackers to access Plaintiff's financial accounts and to steal funds from Plaintiff.

## PARTIES

1. Plaintiff, Christopher Wenzke, is a resident of the state of Delaware.

2. Defendant, T-Mobile US, Inc. ("T-Mobile") is a Delaware corporation with its principal place of business in the state of Washington.

3. John Does 1-25, are fictitious names of individuals and businesses alleged for the purpose of substituting names of defendants whose identities will be disclosed in discovery and who should be made parties to this action.

## JURISDICTION AND VENUE

4. This Court has jurisdiction over this matter under 28 U.S.C. § 1331 because this case arises under federal question jurisdiction under the Federal Communications Act ("FCA"). The Court has supplemental jurisdiction under 28 U.S.C. § 1367 over any state law claims because the claims are derived from a common nucleus of operative facts.

5. Venue in this district is proper on the following bases:

   a. Venue is proper pursuant to 28 U.S.C. § 1391(b)(1) because all defendants are residents of this judicial district pursuant to 28 U.S.C. § 1391(c)(2).

   b. Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.

## FACTUAL ALLEGATIONS

6. This case arises out of the March 2021 hacking of Plaintiff's personal information, which occurred on two occasions and which was facilitated, aided and abetted by T-Mobile's employees.

7. As detailed herein, T-Mobile, through its employees, allowed hackers to "swap" Plaintiff's SIM card into a phone controlled by them, paving the way for the hackers to steal funds belonging to Plaintiff.

8. By allowing the hackers to swap Plaintiff's SIM into a phone controlled by them, T-Mobile provided the hackers with access to Plaintiff's financial accounts.

9. T-Mobile's conduct also involves moral culpability. Aware of the vulnerability of its

customers in having their personal information stolen through SIM swapping, T-Mobile has done *nothing* to prevent that practice and has failed to adhere to its own privacy policy or promises to provide special or additional protection to its customers' accounts.

10. Besides the numerous promises that T-Mobile makes to its customers, federal and state law impose duties on T-Mobile to take all reasonable and necessary steps to preserve the privacy of its customers. With respect to Plaintiff, T-Mobile breached its duty.

11. T-Mobile has failed to implement sufficient measures to provide Plaintiff with adequate protection against unauthorized disclosures of his private information.

12. Due to T-Mobile's conduct, Plaintiff was damaged, as detailed herein.

13. T-Mobile is also vicariously liable for the conduct of its employees, as detailed herein.

14. All of the conduct, actions, and omissions complained of herein were negligent, grossly negligent, reckless, malicious, and/or intentional.

15. At all points the conduct, actions, and omissions of T-Mobile's employees were foreseeable to T-Mobile, within the scope of their employment for T-Mobile, done at T-Mobile's direction and/or with T-Mobile's authorization.

### SIM SWAPPING

16. SIM swapping (also known as SIM theft or SIM-jacking) consists of the unauthorized insertion of a "SIM" or "Subscriber Identity Module" (also known as a "SIM card") into a mobile device enabling the device to communicate with the service provider. A SIM contains data necessary to make a successful connection between the mobile phone and the telecommunications provider.  SIM cards store files that are used to uniquely identify them.

17. Through a SIM swap, a hacker gains access to a victim's telephone account or number by

having the carrier install a SIM card for the victim's account into the hacker's phone to redirect communications, including text messages, sent to the victim's mobile telephone on a telephone controlled by the hacker.

18. A perpetrator typically arranges through bribery of some person (often an employee of a telecommunications provider) with access to customer information at the carrier to have the carrier change the SIM card assigned to a user to a telephone under the control of the hacker.

19. Once the SIM transfer has occurred, the hacker uses the hacker's phone which contains a SIM card associated with the victim's account to impersonate the victim with service providers, such as e-mail providers, and uses the victim's phone number to request changes to account settings and to reset passwords to take control of the victim's accounts and private information.

20. This is a direct, intentional form of theft, similar to stealing the key to a car.  The sole reason for these bribes is the enabling of thieves to hack into bank accounts, credit card records and digital assets, including cryptocurrency, stored in digital wallets that would not have otherwise been accessible without the theft of the digital identity "key" found in the SIM.

## THE MARCH 2, 2021 HACK (CALIFORNIA)

21. On or about March 2, 2021, Plaintiff, who was located in Delaware, discovered that his T-Mobile cell phone had suddenly became inoperable. Later that evening, Plaintiff called T-Mobile and he was told to try a network reset.  He did that but still had no signal.

22. The same day, Plaintiff went to the local T-Mobile store in Bear, Delaware and the T-Mobile employee said that Plaintiff's SIM card had gone bad and that it needed to be

replaced.  T-Mobile replaced the SIM card at the store.  Plaintiff's phone came on – and he left.

23. On March 3, 2021, at approximately 10:00 pm, Plaintiff received text message notifications that someone logged into his "Bitrue" account – an account he used to hold cryptocurrency.

24. Plaintiff was initially unable to log into his Bitrue account – but was eventually able to access it.  He received a text from a phone number purporting to be from the Bitrue help desk, but which Plaintiff now believes was from the individuals who hacked his phone.

25. On March 4, 2021, Plaintiff came to the realization that he had received three emails from another cryptocurrency account of his – this one held at Binance US ("Binance"). The emails were confirmations of transactions that were attributed to Plaintiff – but which he had not performed.

26. Specifically, the emails from Binance were confirmations of Plaintiff's purchase of bitcoin cryptocurrency at Binance with $38,000.00 in U.S. dollars that he been holding in his Binance US account – a transaction which Plaintiff had not himself performed or authorized.  Plaintiff was also holding approximately $11,000.00 worth of Vechain, another cryptocurrency, in his Binance account.

27. Within seconds of reading the aforementioned emails, all of the assets that Plaintiff had in his Binance US account had disappeared and all of the assets in Plaintiff's Binance account (totaling approximately $49,981.00) had been withdrawn.

28. Shortly thereafter, the emails that Plaintiff had received and read were deleted from Plaintiff's email account.  At this point, Plaintiff realized that his email, his Bitrue account and his Binance account had all been hacked.

29. Plaintiff then received a phone call from Bitrue, purportedly from the "fraud department"
– which Plaintiff came to realize was from the hackers themselves attempting to access
his Bitrue account, just as they had accessed his Binance account.

30. On March 4, 2021, Plaintiff contacted T-Mobile's customer service department, as his
Binance account was being drained and instructed T-Mobile to put a security alert on his
account.

31. Upon information and belief, T-Mobile did nothing in response to Plaintiff's request, and
failed to adequately protect his account, because on March 11, 2021, Plaintiff's SIM card
was hacked *again*.

### THE MARCH 11, 2021 HACK (MICHIGAN OR WISCONSIN)

32. On March 11, 2021, Plaintiff's cell phone stopped working again – and he realized he
had been hacked again.  Plaintiff immediately drove to the T-Mobile store in
Wilmington, DE and informed T-Mobile's representative that he had been hacked again.
T-Mobile's employee reactivated Plaintiff's phone.

33. Plaintiff spoke to the T-Mobile manager on site, Lindsey Ott, and was told that managers
and employees at T-Mobile stores in California and either Michigan or Wisconsin had
**overridden** Plaintiff's PIN number, a policy which had been implemented by T-Mobile
on March 8, 2021, on multiple occasions.

34. Plaintiff was told by Ms. Ott that hackers pretending to Plaintiff had walked into T-
Mobile stores and were given access *by T-Mobile* to Plaintiff's SIM card.

35. Through Ms. Ott, Plaintiff submitted a dispute with T-Mobile.  She explained that it was
now the job of T-Mobile's loss prevention and legal team to "figure out what happened."
She said that she put in Plaintiff's contact information and that T-Mobile would be

reaching out to Plaintiff and that she could not see why T-Mobile would *not* contact them.

36. T-Mobile never responded or contacted Plaintiff at all to address the issue.

37. On March 12, 2021, Plaintiff returned to the T-Mobile store in Wilmington, Delaware and was told by a T-Mobile employee that this was not an unfamiliar fact pattern. The T-Mobile employee specifically stated, "unfortunately, we see this" and that "it's a problem everywhere."

38. The T-Mobile employee stated that "fraud is very prevalent" but that T-Mobile's system **did not allow** the employee to confirm whether someone who came into the store and presented an ID was *actually* the individual whose ID was being presented.

39. That same day, Plaintiff again spoke to the manager, Lindsey Ott, and was again told that managers and employees at T-Mobile stores in California and either Michigan or Wisconsin had **overridden** Plaintiff's PIN number, a policy which had been implemented by T-Mobile on March 8, 2021.  The *first* hack took place in California and the *second* hack took place in either Michigan or Wisconsin.

40. Plaintiff was again told by Ms. Ott that hackers pretending to Plaintiff had walked into T-Mobile stores and that **T-Mobile** gave the hackers the ability and access to Plaintiff's account to change Plaintiff's SIM card.

41. Ms. Ott further explained that the T-Mobile employee involved in the March 11, 2021 hacking incident in either Michigan or Wisconsin was an assistant manager who bypassed additional security procedures that had been instituted by T-Mobile on March 8, 2021 with respect to Plaintiff's account.

42. Ms. Ott stated that she would "like to think" that T-Mobile's employees were not "in on

this".

43. Ms. Ott stated that the dispute she had submitted on behalf of Plaintiff had already been sent over to "corporate investigations." She indicated that not only would T-Mobile be reaching out to Plaintiff, but also to the employees at the stores where the hacks took place.

44. The employees at the T-Mobile stores who unlawfully provided the hackers access to Plaintiff's SIM card were either willfully blind or complicit in the wrongdoing.  Further, T-Mobile knew or should have known of the potential for fraud arising out of its employees' ability to bypass its security procedures.

45. In cooperating with the hackers committing SIM swap fraud to plunder Plaintiff's accounts, T-Mobile violated its own policies as well as the requirements of the FCA.

46. T-Mobile failed to properly to supervise its employees, despite its knowledge that its employees cooperated in precisely this type of fraud.

47. Because of T-Mobile's cooperation and failure to follow its own policies, the hackers were able to intercept Plaintiff's personal information.

48. As a direct and proximate result of T-Mobile's willing cooperation with the hackers, gross negligence, violation of its statutory duties, and failure to adhere to its commitments in its own policies, Plaintiff has been damaged.

49. As a result of T-Mobile's tortious conduct as described herein, Plaintiff has had to cancel all of his bank accounts, lock his social security number and take other measures to protect his identity and private information that he would not have otherwise had to do but for T-Mobile's conduct.

## T-MOBILE'S FAILURE TO ADDRESS SIM SWAPPING

50. T-Mobile has failed to address the harm caused by or to take action to prevent ongoing SIM swap frauds.

51. T-Mobile failed to supervise its employees adequately or prevent them from turning over the digital "keys" of Plaintiff's accounts to hackers.

52. Plaintiff, a T-Mobile subscriber who entrusted his sensitive private information to T-Mobile and relied on T-Mobile's assurances and its compliance with applicable laws, believed that T-Mobile would keep its promises.

53. In reality, however, Plaintiff was victimized by not one, but two hacks within the same month – both facilitated by T-Mobile.

54. T-Mobile employees' cooperation allowed a criminal gang to use their control of Plaintiff's telephone account to steal from Plaintiff.

55. The SIM was an absolutely necessary component of the hack, without which the hackers would have never been able to access Plaintiff's accounts.

56. It was T-Mobile's act of providing hackers with access to Plaintiff's telephone account through enabling its employees and agents the unfettered ability to falsify records and transfer the SIM to a phone under their control, without adhering to its security procedures, that allowed the theft to occur.

57. T-Mobile failed to protect Plaintiff from SIM card fraud and the subsequent theft and is therefore directly culpable for the foreseeable nature of these attacks.

58. T-Mobile was obliged to but failed to install basic security precautions for preventing its employees from fraudulently transferring a SIM card to a criminal gang.

59. This lawsuit seeks to hold T-Mobile accountable for its abject failure to protect Plaintiff.

60. T-Mobile further knew that SIM swapping fraud has become more and more prevalent as a gateway to the access of customers' accounts, resulting in a wide variety of harms.

61. Upon information and belief, T-Mobile has been and continues to be subject to numerous incidents of SIM card swap fraud and is aware that its employees are complicit in such fraud and can bypass T-Mobile's security. Nevertheless, T-Mobile has failed to secure its system against this fraudulent activity.

## T-MOBILE'S STATUTORY OBLIGATION TO PROTECT CUSTOMERS' PERSONAL INFORMATION UNDER THE FEDERAL COMMUNICATIONS ACT

62. T-Mobile is a "common carrier" governed by the Federal Communications Act ("FCA"), 47 U.S.C. § 151 et seq. T-Mobile is regulated by the Federal Communications Commission ("FCC") for its acts and practices, including those occurring in this District.

63. As a common carrier, T-Mobile is obligated to protect the confidential personal information of its customers under Section 222 of the FCA, 47 U.S.C. § 222.

64. Section 222(a), 47 U.S.C. § 222(a), provides that "[e]very telecommunications carrier has a duty to protect the confidentiality of proprietary information of, and relating to . . . customers . . .." The "confidential proprietary information" referred to in Section 222(a), is abbreviated herein as "CPI."

65. Section 222(c), 47 U.S.C. § 222(c), additionally provides that "[e]xcept as required by law or with the approval of the customer, a telecommunications carrier that receives or obtains customer proprietary network information by virtue of its provision of a telecommunications service shall only use, disclose, or permit access to individually identifiable customer proprietary network information in its provision of (A) the telecommunications service from which such information is derived, or (B) services necessary to, or used in, the provision of such telecommunications service, including the

publishing of directories." The "customer proprietary network information" referred to in Section 222(c) is abbreviated herein as "CPNI."

66. Section 222(h)(1), 47 U.S.C. § 222(h)(1), defines CPNI as "(A) information that relates to the quantity, technical configuration, type, destination, location, and amount of use of a telecommunications service subscribed to by any customer of a telecommunications carrier, and that is made available to the carrier by the customer solely by virtue of the carrier-customer relationship; and (B) information contained in the bills pertaining to telephone exchange service or telephone toll service received by a customer of a carrier, except that term does not include subscriber list information."

67. The FCC has promulgated rules to implement Section 222 "to ensure that telecommunications carriers establish effective safeguards to protect against unauthorized use or disclosure of CPNI. See 47 CFR § 64.2001 et seq. ("CPNI Rules"); CPNI Order, 13 FCC Rcd. at 8195 ¶ 193.

68. The CPNI Rules limit disclosure and use of CPNI without customer approval to certain limited circumstances (such as cooperation with law enforcement), none of which are applicable to the facts here. 47 CFR § 64.2005.

69. The CPNI Rules require carriers to implement safeguards to protect customers' CPNI. These safeguards include: (i) training personnel "as to when they are and are not authorized to use CPNI"; (ii) establishing "a supervisory review process regarding carrier compliance with the rules;" and (iii) filing annual compliance certificates with the FCC. 47 CFR § 64.2009(b), (d), and (e).

70. The CPNI Rules further require carriers to implement measures to prevent the disclosure of CPNI to unauthorized individuals. 47 CFR § 64.2010. For example, "carriers must

take reasonable measures to discover and protect against attempts to gain unauthorized access to CPNI." 47 CFR § 64.2010(a). Moreover, "carriers must properly authenticate a customer prior to disclosing CPNI based on customer-initiated telephone contact, online account access, or an in-store visit." Id. In the case of in-store access to CPNI, "[a] telecommunications carrier may disclose CPNI to a customer who, at a carrier's retail location, first presents to the telecommunications carrier or its agent a valid photo ID matching the customer's account information." 47 CFR § 64.2010(d) (emphasis added). "Valid photo ID" is defined in 47 CFR § 64.2003(r) as "a government-issued means of personal identification with a photograph such as a driver's license, passport, or comparable ID that is not expired."

71. The FCC has determined that information obtained from customers through a common social engineering ploy known as "pretexting" is CPNI. See In the Matter of Implementation of the Telecommunications Acts of 1996: Telecommunications Carriers' Use of Customer Proprietary Network Information and Other Customer Information, 22 FCC Rcd. 6927 (2007) ("Pretexting Order"). Pretexting is "the practice of pretending to be a particular customer or other authorized person in order to obtain access to that customer's call detail or other private communications records." Id., n. 1. Such "call detail" and "private communications" are CPI and CPNI under the FCA. Id. at 6928 et seq.

72. The FCC concluded that "pretexters have been successful at gaining unauthorized access to CPNI" and that "carriers' record on protecting CPNI demonstrate[d] that the Commission must take additional steps to protect customers from carriers that have failed to adequately protect CPNI." Id. at 6933. The FCC modified its rules to impose

additional security for carriers' disclosure of CPNI and to require that law enforcement and customers be notified of security breaches involving CPNI. Id. at 23 6936-62.

73. In its Pretexting Order, the FCC stated that it "fully expect[s] carriers to take every reasonable precaution to protect the confidentiality of proprietary or personal customer information." Id. at 6959, ¶ 64. The FCC further stated that "[w]e decline to immunize carriers from possible sanction for disclosing customers' private information without appropriate authorization." Id. at 6960, ¶ 66. In a statement directly relevant to the facts alleged below, the FCC also stressed the fact that someone having obtained information fraudulently is strong evidence of the carrier's failure to satisfy the requirements of section 222.

74. The FCC stated that "we hereby put carriers on notice that the Commission henceforth will infer from evidence that a pretexter has obtained unauthorized access to a customer's CPNI that the carrier did not sufficiently protect that customer's CPNI. A carrier then must demonstrate that the steps it has taken to protect CPNI from unauthorized disclosure, including the carrier's policies and procedures, are reasonable in light of the threat posed by pretexting and the sensitivity of the customer information at issue." Id. at 6959, ¶ 63 (emphasis added).

75. As further alleged below, T-Mobile violated Section 222 of the FCA when its employees provided hackers with Plaintiff's SIM cards containing or allowing access to Plaintiff's personal information, including CPI and CPNI, without Plaintiff's authorization or permission, and without requiring that the individual accessing Plaintiff's account to present valid identification or comply with T-Mobile's own procedures.

**T-MOBILE'S PRIVACY AND SECURITY COMMITMENTS TO CUSTOMERS**

76. In its Terms and Conditions (https://www.t-mobile.com/responsibility/legal/terms-and-conditions), T-Mobile promises that it strives to protect consumer accounts. T-Mobile utterly failed in this instance to keep that promise to Plaintiff.

77. In its Privacy Notice (https://www.t-mobile.com/privacy-center/our-practices/privacy-policy), T-Mobile states that it believes that its customers "deserve transparency, education, choice, protection, and simplicity".

78. In its Privacy Notice, T-Mobile further communicates the following uses of customers' personal data:

## How We Use Personal Data About You

We use your personal data for a lot of reasons, including to provide you with products and services. We use your personal data to do things like:

- Create and administer your accounts, complete transactions, payments, billing, and requests related to our products and services and third-party products and services that you charge to your accounts.
- Provide, develop, customize, and personalize products and services, respond to your inquiries conduct surveys, and perform our contractual obligations.
- Advertise and market products and services from T-Mobile and other companies to you, including through targeted advertising and communications about promotions and events, contents, and sweepstakes.
- To conduct research and create reports from analysis of things like usage patterns and trends and deidentify or aggregate personal data to create business and market analysis and reports.
- Detect and help protect against security incidents, and illegal, fraudulent, or unauthorized activities; investigate suspicious traffic, cybersecurity threats or vulnerabilities, complaints, and claims; authenticate your credentials for account access and information and provide other security protections.
- Protect you and others from fraudulent, malicious, deceptive, abusive, or unlawful activities.
- Debug and repair errors and take action to maintain and improve the quality and safety of our products and services.
- Verify your identity and determine your eligibility for accounts, discounts, and specific rate plans, as well as the validity of your payment information.
- Facilitate or verify the appropriate calculation of taxes, fees, or other obligations due to local, state, or federal government requirements.
- Cooperate with law enforcement and protect the rights, interests, safety, or property of T-Mobile and others.
- Comply with and enforce applicable legal and regulatory obligations and respond to governmental requests.
- Enforce our policies, terms and conditions, or other agreements.
- Defend against or pursue claims, disputes, or litigation.

79. Despite the promises in the Privacy Notice, T-Mobile failed to protect Plaintiff from the illegal and wrongful activities that occurred herein.

80. Further, in T-Mobile's Privacy Notice, T-Mobile states that it uses "administrative, technical, contractual, and physical safeguards designed to protect your data while it is under our control. For example, when you contact us by phone or visit us in our stores, we have procedures in place to make sure that only the primary account holder or authorized users have access."

81. Clearly, in this instance, T-Mobile did *not* ensure that *only* Plaintiff had access to his account.

82. T-Mobile possesses sensitive, detailed information about its customers, such as Plaintiff, who rely on T-Mobile to safeguard that information.

83. As alleged below, T-Mobile flagrantly and repeatedly violated its commitments to Plaintiff in its Terms and Conditions and Privacy Notice, as well as its legal obligations willingly turning over information to hackers that allowed those hackers to access Plaintiff's account.

84. T-Mobile violated its obligations to protect Plaintiff, who became a victim of SIM theft due to T-Mobile's negligence and refusal to implement elementary security precautions.

85. T-Mobile is directly liable for the harm suffered by Plaintiff because T-Mobile has long known that its customers are subject to SIM swap fraud perpetrated by hackers - often with the active cooperation of its own employees and/or agents.

86. T-Mobile knew well before the attacks on Plaintiff that it was subject to widespread SIM swap fraud through the active involvement of T-Mobile employees.

87. T-Mobile knew or should have known that its employees frequently cooperated with hackers and thieves to bypass its security procedures.

88. Despite its knowledge that its employees and agents actively cooperate with hackers to rob its own customers, T-Mobile is doing nothing to prevent such scams.

89. The prevalence of SIM swap fraud and T-Mobile's knowledge of such fraud, including the active participation of its own employees in the fraud, demonstrate that the SIM swap fraud on Plaintiff was neither an isolated nor an unforeseeable event.

### PLAINTIFF'S SPECIAL RELATIONSHIP WITH T-MOBILE

90. As alleged herein, and to the extent that it is determined to be applicable to certain claims, Plaintiff had a "special relationship" with T-Mobile which gave rise to a duty of care on the part of T-Mobile.

91. Plaintiff had a contract for services with T-Mobile, pursuant to which T-Mobile provided services such as telephone services, including the ability not only to make telephone calls, but also to receive messages, access the Internet, send e-mail messages, and access and use a wide variety of programs and applications.

92. The transaction between Plaintiff and T-Mobile was undoubtedly meant to benefit Plaintiff by providing him the ability to use his mobile telephone for all of the purposes which he expected and which were intended by T-Mobile.

93. It was entirely foreseeable to T-Mobile that Plaintiff would be harmed if he would not longer to be able to use his telephone for its intended purposes and instead that private communications intended for Plaintiff were intercepted by hackers.

### COUNT I

**Unauthorized Disclosure of Customer Confidential Proprietary Information and Proprietary Network Information**

**(Federal Communications Act, 47 U.S.C. §§ 206, 222)**

94. Plaintiff realleges the allegations in the foregoing paragraphs as if fully set forth herein.

95. T-Mobile is a "common carrier" engaging in interstate commerce by wire regulated by the Federal Communications Act ("FCA") and subject to the requirements, inter alia, of sections 206 and 222 of the FCA.

96. Under section 206 of the FCA, 47 U.S.C. § 206, "[i]n case any common carriers shall do, or cause or permit it to be done, any act, matter, or thing in this chapter prohibited or

declared to be unlawful, or shall omit to do any act, matter, or thing in this chapter required to be done, such common carrier shall be liable to the person or persons injured thereby for the full amount of damages sustained in consequence of any such violation of the provisions of this chapter, together with a reasonable counsel or attorney's fee, to be fixed by the court in every case of recovery, which attorney's fee shall be taxed and collected as part of the costs in the case.

97. Section 222(a) of the FCA, 47 U.S.C. § 222(a), requires every telecommunications carrier to protect, among other things, the confidentiality of proprietary information of, and relating to, customers ("CPI").

98. Section 222(c)(1) of the FCA, 27 U.S.C. § 222(c)(1) further requires that, "[e]xcept as required by law or with the approval of the customer, a telecommunications carrier that receives or obtains customer proprietary information by virtue of its provision of a telecommunications service shall only use, disclose, or permit access to customer proprietary network information ['CPNI'] in its provision of (A) telecommunications services from which such information is derived, or (B) services necessary to or used in the provision of such telecommunication services."

99. The information disclosed to hackers by T-Mobile in the March 2011 incidents referenced herein fell within the scope of the definitions of CPI and CPNI under Section 222 of the FCA.

100.     T-Mobile failed to protect the confidentiality of Plaintiff's CPI and CPNI, including his wireless telephone number, account information, and his private communications, by divulging that information to hackers.

101.     Through its negligence, gross negligence and deliberate acts, including

inexplicable failures to follow its own security procedures, supervise its employees, the CPNI Regulations, the warnings of the Pretexting Order, its own Terms and Conditions and Privacy Notice, and by allowing its employees to bypass such procedures, T-Mobile permitted hackers to access Plaintiff's account, which they used to reset the passwords on and gain access to Plaintiff's financial accounts, which resulted in a direct loss to Plaintiff of approximately $50,000.00.

102.     As a direct consequence of T-Mobile's violations of the FCA, Plaintiff has been damaged.

103.     Plaintiff is also entitled to his attorney's fees under the FCA in bringing this action against T-Mobile.

104.     Due to the outrageous, malicious, reckless, and intentional nature of the conduct, punitive damages are requested.

**WHEREFORE**, Plaintiff demands that judgment be entered against Defendant for actual damages, statutory damages, punitive damages, for costs and reasonable attorney's fees, for pre- and post-judgment interest and for such other and further relief as may be just and proper.

## COUNT II

### Negligence

105.     Plaintiff realleges the allegations in the foregoing paragraphs as if fully set forth herein.

106.     As alleged herein, the special relationship between T-Mobile and Plaintiff gave rise to duties of care owed by T-Mobile to Plaintiff.

107.     T-Mobile owed a duty to Plaintiff to exercise reasonable care in safeguarding and protecting his personal information, including CPI and CPNI, and keeping it from being

compromised, lost, stolen, misused and/or disclosed to unauthorized parties. This duty included, among other things, designing, maintaining, and testing its security systems to ensure that Plaintiff's personal information, including CPI and CPNI, was adequately secured and protected.

108.     T-Mobile knew that Plaintiff's personal information, including CPI and CPNI, was confidential and sensitive.

109.     By being entrusted by Plaintiff to safeguard his personal information, including CPI and CPNI, T-Mobile had a special relationship with Plaintiff. Plaintiff signed up for T-Mobile's wireless services and agreed to provide his personal information to T-Mobile with the understanding that T-Mobile would take appropriate measures to protect it. But T-Mobile did not protect Plaintiff's personal information and violated his trust.

110.     T-Mobile breached its duty to exercise reasonable care in safeguarding and protecting Plaintiff's personal information, including CPI and CPNI, by failing to adopt, implement, and maintain adequate security measures to safeguard that information.

111.     T-Mobile's failure to comply with federal and state requirements for security further evidences T-Mobile's negligence in failing to exercise reasonable care in safeguarding and protecting Plaintiff's personal information, including CPI and CPNI.

112.     But for T-Mobile's wrongful and negligent breach of its duties owed to Plaintiff, his personal information, including his CPI and CPNI, would not have been compromised, stolen, viewed, and used by unauthorized persons.

113.     T-Mobile's negligence was a direct and legal cause of the theft of Plaintiff's personal information and the legal cause of his resulting damages.

114.     The injury and harm suffered by Plaintiff was the reasonably foreseeable result of

T-Mobile's failure to exercise reasonable care in safeguarding and protecting Plaintiff's personal information, including his CPI and CPNI.

115.     T-Mobile's misconduct amounted to a willful and conscious disregard of the rights or safety of Plaintiff and despicable conduct that has subjected Plaintiff to cruel and unjust hardship in conscious disregard of his rights.  Due to the outrageous, malicious, reckless, and intentional nature of the conduct, punitive damages are requested.

**WHEREFORE**, Plaintiff demands that judgment be entered against Defendant for actual damages, statutory damages, punitive damages, for costs and reasonable attorney's fees, for pre- and post-judgment interest and for such other and further relief as may be just and proper.

## COUNT III

### Negligent Supervision and Training

116.     Plaintiff realleges the allegations in the foregoing paragraphs as if fully set forth herein.

117.     As alleged herein, the special relationship between T-Mobile and Plaintiff gave rise to duties of care owed by T-Mobile to Plaintiff.

118.     T-Mobile owed a duty to Plaintiff to exercise reasonable care in supervising and training its employees to safeguard and protect Plaintiff's personal information, including CPI and CPNI, and to keep it from being compromised, lost, stolen, misused and/or disclosed to unauthorized parties.

119.     T-Mobile was aware of the ability of its employees to bypass its security measures and the fact that its employees actively participated in fraud involving its customers, including SIM card swap fraud, by bypassing such security measures.

120.     T-Mobile knew that Plaintiff's personal information, including CPI and CPNI, was confidential and sensitive.

121.     T-Mobile further knew that Plaintiff's personal information was vulnerable to hacks and SIM swap fraud by thieves and other criminals.

122.     By being entrusted by Plaintiff to safeguard his personal information, including CPI and CPNI, T-Mobile had a special relationship with Plaintiff. Plaintiff agreed to provide his personal information to T-Mobile with the understanding that T-Mobile's employees would take appropriate measures to protect it.

123.     T-Mobile breached its duty to supervise and train its employees to safeguard and protect Plaintiff's personal information, including CPI and CPNI, by not requiring them to adhere to its obligations under the CPNI Rules, and other legal provisions.

124.     As detailed herein, T-Mobile's employees not only failed to prevent, but they actually *facilitated* the SIM swap fraud on Plaintiff.

125.     T-Mobile knew its supervision and monitoring of its employees was inadequate through its knowledge from prior incidents that its employees cooperated with hackers in SIM swap fraud.

126.     T-Mobile is morally culpable, particularly given prior security breaches involving its own employees.

127.     T-Mobile breached its duty to exercise reasonable care in supervising and monitoring its employees to protect Plaintiff's personal information, including CPI and CPNI.

128.     T-Mobile's failure to comply with the requirements of the FCA and CPNI Rules further evidences T-Mobile's negligence in adequately supervising and monitoring its

employees so that they would safeguard and protect Plaintiff's personal information, including CPI and CPNI.

129.     But for T-Mobile's wrongful and negligent breach of its duties to supervise and monitor its employees, Plaintiff's CPI and CPNI would not have been disclosed to unauthorized individuals through SIM swap fraud.

130.     T-Mobile's negligence was a direct and legal cause of the theft of Plaintiff's personal information and the legal cause of his resulting damages, as detailed herein.

131.     The injury and harm suffered by Plaintiff was the reasonably foreseeable result of T-Mobile's failure to supervise and monitor its employees in safeguarding and protecting Plaintiff's personal information, including his CPI and CPNI.

132.     T-Mobile's misconduct amounted to a willful and conscious disregard of the rights or safety of Plaintiff and despicable conduct that has subjected Plaintiff to cruel and unjust hardship in conscious disregard of his rights.  Due to the outrageous, malicious, reckless, and intentional nature of the conduct, punitive damages are requested.

**WHEREFORE**, Plaintiff demands that judgment be entered against Defendant for actual damages, statutory damages, punitive damages, for costs and reasonable attorney's fees, for pre- and post-judgment interest and for such other and further relief as may be just and proper.

## COUNT IV

### Negligent Hiring

133.     Plaintiff realleges the allegations in the foregoing paragraphs as if fully set forth herein.

134.     As alleged herein, the special relationship between T-Mobile and Plaintiff gave rise to duties of care owed by T-Mobile to Plaintiff.

135.     T-Mobile owed a duty to Plaintiff to exercise reasonable care in hiring competent, honest, and ethical employees to safeguard and protect Plaintiff's personal information, including CPI and CPNI, to keep it from being compromised, lost, stole, misused and/or disclosed to unauthorized parties.

136.     T-Mobile also owed a duty to exercise reasonable care in the operation of T-Mobile stores and their hiring of employees for those T-Mobile stores.

137.     T-Mobile knew that Plaintiff's personal information, including CPI and CPNI, was confidential and sensitive.

138.     T-Mobile further knew that Plaintiff's personal information was vulnerable to hacks and SIM swap fraud by thieves and other criminals

139.     T-Mobile also knew from prior incidents of SIM swap fraud, or should have known, that its employees cooperated with hackers and thieves defrauding T-Mobile's own customers.

140.     By being entrusted by Plaintiff to safeguard his personal information, including CPI and CPNI, T-Mobile had a special relationship with Plaintiff.

141.     Plaintiff signed up for T-Mobile's wireless services and agreed to provide his personal information to T-Mobile with the understanding that T-Mobile's employees

would take appropriate measures to protect it.

142.     T-Mobile breached its duty to hire employees who would safeguard and protect Plaintiff's personal information, including CPI and CPNI.

143.     T-Mobile breached its duty to properly hire competent, honest and ethical employees to protect Plaintiff's personal information, including CPI and CPNI.

144.     But for T-Mobile's wrongful and negligent breach of its duties to hire ethical and competent employees, Plaintiff's CPI and CPNI would not have been disclosed to unauthorized individuals through SIM swap fraud.

145.     T-Mobile's negligence was a direct and legal cause of the theft of Plaintiff's personal information and the legal cause of his resulting damages.

146.     The injury and harm suffered by Plaintiff was the reasonably foreseeable result of T-Mobile's failure to hire competent and ethical employees who would safeguard and protect Plaintiff's personal information, including his CPI and CPNI. Indeed, this failure on the part of T-Mobile led to the SIM card fraud complained of herein.

147.     Further, T-Mobile's misconduct amounted to a willful and conscious disregard of the rights or safety of Plaintiff and despicable conduct that has subjected Plaintiff to cruel and unjust hardship in conscious disregard of his rights.  Due to the outrageous, malicious, reckless, and intentional nature of the conduct, punitive damages are requested.

**WHEREFORE**, Plaintiff demands that judgment be entered against Defendant for actual damages, statutory damages, punitive damages, for costs and reasonable attorney's fees, for pre- and post-judgment interest and for such other and further relief as may be just and proper.

## COUNT V

### Breach of Implied Covenant of Good Faith and Fair Dealing

148.     Plaintiff realleges the allegations in the foregoing paragraphs as if fully set forth herein.

149.     T-Mobile owed Plaintiff an implied duty of good faith and fair dealing under the agreement between T-Mobile and Plaintiff that it would adequately protect his personal information and maintain the confidentiality, privacy security of Plaintiff's personal information, including CPI and CPNI.

150.     By failing to protect Plaintiff's personal information or to maintain the confidentiality, privacy security of Plaintiff's personal information, including CPI and CPNI, T-Mobile breached its implied duty to act in good faith as detailed herein.

151.     T-Mobile's breach of the implied duties described herein was a direct and legal cause of the theft of Plaintiff's personal information and the legal cause of his resulting damages.

152.     Further, T-Mobile's misconduct amounted to a willful and conscious disregard of the rights or safety of Plaintiff and despicable conduct that has subjected Plaintiff to cruel and unjust hardship in conscious disregard of his rights.  As a result, Plaintiff is further entitled to punitive damages against T-Mobile.

**WHEREFORE**, Plaintiff demands that judgment be entered against Defendant for actual damages, statutory damages, punitive damages, for costs and reasonable attorney's fees, for pre- and post-judgment interest and for such other and further relief as may be just and proper.

## COUNT VI

### Intentional/Negligent Infliction of Emotional Distress

153.     Plaintiff realleges the allegations in the foregoing paragraphs as if fully set forth herein.

154.     The elements of intentional infliction of emotional distress are that Defendant (1) acted intentionally or recklessly, (2) acts and omissions were extreme and outrageous, (3) Plaintiff suffered serious emotional distress, and (4) Defendant's conduct was a substantial factor in bringing about Plaintiff's serious emotional distress.

155.     The elements of negligent infliction are that (1) the Defendant was negligent, (2) the plaintiff suffered serious emotional distress, and (3) Defendant's negligence was a substantial factor in causing the serious emotional distress.

156.     T-Mobile is vicariously liable for the conduct of its employees.

157.     The conduct of T-Mobile and T-Mobile's employees, as complained of herein, was negligent, grossly negligent, reckless, malicious, and/or intentional.

158.     The conduct, actions, and omissions of the T-Mobile and T-Mobile's employees individual Defendants and other T-Mobile employees was foreseeable to T-Mobile and done at T-Mobile's direction and/or authorization.

159.     T-Mobile and its employees acted with negligence and/or reckless disregard and/or intentional disregard of the probability that Plaintiff (and many other customers across the country) would suffer severe emotional distress as result of the damages resulting from T-Mobile's actions and omissions complained herein.

160.     In failing to protect Plaintiff's personal information and/or adequately supervise its employees, as further detailed herein, T-Mobile acted with negligent and/or reckless

disregard of the probability that Plaintiff would suffer severe emotional distress as result of its actions and omissions.

161.      As a direct and proximate result of T-Mobile's conduct, Plaintiff has suffered severe damages, including but not limited to monetary damages, severe emotional distress, mental suffering, mental anguish, sleeplessness, restlessness, anxiety, and depression.

162.      T-Mobile's conduct was a substantial factor in causing Plaintiff's serious and severe emotional distress.

163.      The acts and omissions of T-Mobile and T-Mobile's employees were extreme and outrageous.

164.      Due to the outrageous, malicious, reckless, and intentional nature of the conduct, punitive damages are requested.

**WHEREFORE**, Plaintiff demands that judgment be entered against Defendant for actual damages, statutory damages, punitive damages, for costs and reasonable attorney's fees, for pre- and post-judgment interest and for such other and further relief as may be just and proper.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendant as follows:

i.      For actual damages, in an amount to be determined at trial;

ii.      For statutory damages, in an amount to be determined at trial;

iii.      For exemplary and punitive damages, in an amount to be determined at trial;

iv.      For costs and reasonable attorney's fees under the FCA and any other applicable statutory provision;

v.      For pre- and post-judgment interest and for such other and further relief as may be

just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands trial by jury in this action of all issues so triable.

Respectfully Submitted,

**GARIBIAN LAW OFFICES, P.C.**

/s/ Antranig Garibian
Antranig Garibian, Esquire (Bar No. 4962)
1010 N. Bancroft Parkway, Suite 22
Wilmington, DE 19805
(302) 722-6885
ag@garibianlaw.com
*Counsel for Plaintiff*